NAME *Marquece Lamar Hollingsworth*

PRISON IDENTIFICATION/BOOKING NO. *BR-1611*

ADDRESS OR PLACE OF CONFINEMENT *Calipatria State Prison*

*P. O. Box 5002, Calipatria CA 92233*

Note: It is your responsibility to notify the Clerk of Court in writing of any change of address. If represented by an attorney, provide his or her name, address, telephone and facsimile numbers, and e-mail address.

FILED
CLERK, U.S. DISTRICT COURT
FEB 28 2025
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

*Fee Due*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

FULL NAME (Include name under which you were convicted) *Marquece Lamar Hollingsworth*

Petitioner,

v.

NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED PERSON HAVING CUSTODY OF PETITIONER *Roberto A. Arias, Warden*

Respondent.

CASE NUMBER:

CV25.1844 - PA (GJS)
(To be supplied by the Clerk of the United States District Court)

☐ _____ **AMENDED**

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY
28 U.S.C. § 2254**

PLACE/COUNTY OF CONVICTION _____
PREVIOUSLY FILED, RELATED CASES IN THIS DISTRICT COURT
(List by case number)
CV _____
CV _____

## INSTRUCTIONS - PLEASE READ CAREFULLY

1.   To use this form, you must be a person who either is currently serving a sentence under a judgment against you in a California state court, or will be serving a sentence in the future under a judgment against you in a California state court. You are asking for relief from the conviction and/or the sentence. This form is your petition for relief.

2.   In this petition, you may challenge the judgment entered by only one California state court. If you want to challenge judgments entered by more than one California state court, you must file a separate petition for each court.

3.   Make sure the form is typed or neatly handwritten. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

4.   Answer all the questions. You do not need to cite case law, but you do need to state the federal legal theory and operative facts in support of each ground. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a legal brief or arguments, you may attach a separate memorandum.

5.   You must include in this petition all the grounds for relief from the conviction and/or sentence that you challenge. You must also state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

6.   You must pay a fee of $5.00. If the fee is paid, your petition will be filed. If you cannot afford the fee, you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out and sign the declaration of the last two pages of the form. Also, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account at the institution. If your prison account exceeds $25.00, you must pay the filing fee.

7.   When you have completed the form, send the original and two copies to the following address:

Clerk of the United States District Court for the Central District of California
United States Courthouse
ATTN: Intake/Docket Section
255 East Temple Street, Suite TS-134
Los Angeles, California 90012

PLEASE COMPLETE THE FOLLOWING (*check appropriate number*):

This petition concerns:
1. ☑ a conviction and/or sentence.
2. ☐ prison discipline.
3. ☐ a parole problem.
4. ☐ other.

## PETITION

1. Venue
   a. Place of detention _Calipatria State Prison, Calipatria, CA_
   b. Place of conviction and sentence _Los Angeles County, CA_

2. Conviction on which the petition is based (*a separate petition must be filed for each conviction being attacked*).
   a. Nature of offenses involved (*include all counts*) : _1st degree murder, attempt to dissuade a witness, assault by force likely to produce GBI, personally discharging a firearm_
   b. Penal or other code section or sections: _§§ 187, 190.2(a)(10) & a(15), 136.1(a)(2), 245(a)(4), 12022.53(d)_
   c. Case number: _Superior Ct # TA148047_
   d. Date of conviction: _September 17, 2021_
   e. Date of sentence: _October 20, 2021_
   f. Length of sentence on each count: _LWOP consecutive to 31 years 8 months to life_
   g. Plea (*check one*) :
      ☑ Not guilty
      ☐ Guilty
      ☐ Nolo contendere
   h. Kind of trial (*check one*) :
      ☑ Jury
      ☐ Judge only

3. Did you appeal to the California Court of Appeal from the judgment of conviction?    ☑ Yes  ☐ No
   If so, give the following information for your appeal (*and attach a copy of the Court of Appeal decision if available*):
   a. Case number: _B315845_
   b. Grounds raised (*list each*) :
      (1) _Trial Court erred by failing to instruct sua sponte on accomplice liability_
      (2) _Insufficient evidence to corroborate accomplice testimony_

(3) Trial Court erred in failing to instruct the jury that the
(4) Cumulative Errors
(5) IAC for failing to move the court to dismiss
(6)

the prosecution must prove each element BRD.

Special Circumstances

c. Date of decision: March 14, 2024

d. Result: Affirmed

4. If you did appeal, did you also file a Petition for Review with the California Supreme Court of the Court of Appeal decision? ☑Yes  ☐No

If so, give the following information *(and attach copies of the Petition for Review and the Supreme Court ruling if available):*

a. Case number: S284722

b. Grounds raised *(list each):*

(1) Same as item # 3(b)(5) above
(2) Same as item # 3(b)(1) above
(3) Same as item # 3(b)(2) above
(4) Same as item # 3(b)(3) above
(5) Same as item # 3(b)(4) above.
(6)

c. Date of decision: May 29, 2024

d. Result: Denied

5. If you did not appeal:

a. State your reasons  N/A

b. Did you seek permission to file a late appeal?  ☐Yes  ☐No

6. Have you previously filed any habeas petitions in any state court with respect to this judgment of conviction?

☐Yes  ☑No

If so, give the following information for each such petition *(use additional pages, if necessary, and attach copies of the petitions and the rulings on the petitions if available):*

a. (1) Name of court:

(2) Case number:

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing):*

(4) Grounds raised *(list each)*:

    (a) _____

    (b) _____

    (c) _____

    (d) _____

    (e) _____

    (f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?     ☐ Yes   ☐ No

b.   (1) Name of court: _____

    (2) Case number: _____

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

    (4) Grounds raised *(list each)*:

        (a) _____

        (b) _____

        (c) _____

        (d) _____

        (e) _____

        (f) _____

    (5) Date of decision: _____

    (6) Result _____

_____

    (7) Was an evidentiary hearing held?     ☐ Yes   ☐ No

c.   (1) Name of court: _____

    (2) Case number: _____

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

    (4) Grounds raised *(list each)*:

        (a) _____

        (b) _____

        (c) _____

        (d) _____

        (e) _____

        (f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?          ☐Yes ☐No

7.   Did you file a petition for certiorari in the United States Supreme Court?          ☐ Yes   ☑ No

   If yes, answer the following:

   (1) Docket or case number (if you know): _____

   (2) Result: _____

   _____

   (3) Date of result (if you know): _____

   (4) Citation to the case (if you know): _____

8.   For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than five grounds. Summarize briefly the <u>facts</u> supporting each ground. For example, if you are claiming ineffective assistance of counsel, you must state facts specifically setting forth what your attorney did or failed to do.

   **CAUTION:**     *Exhaustion Requirement*: In order to proceed in federal court, you must ordinarily first exhaust your state court remedies with respect to each ground on which you are requesting relief from the federal court. This means that, prior to seeking relief from the federal court, you first must present <u>all</u> of your grounds to the California Supreme Court.

   a.   Ground one: The Court Violated Petitioner's 14th Amendment Due Process Rights When It Failed to Sua Sponte Instruct the Jury that Davon Jones Was an Accompli

   (1) Supporting FACTS: See attached Statement of Case and Facts and Points and Authorities in Support of Petition

   (2) Did you raise this claim on direct appeal to the California Court of Appeal?          ☑Yes   ☐No
   (3) Did you raise this claim in a Petition for Review to the California Supreme Court?          ☑Yes   ☐No
   (4) Did you raise this claim in a habeas petition to the California Supreme Court?          ☐Yes   ☑No

   b.   Ground two: The Conviction in Count 3 Violated Petitioner's 14th Amendment Due Process Rights Because There Was Insufficient Evidence to Corroborate Accomplice Liability

   (1) Supporting FACTS: See attached Statement of the Case & Facts and

Points and Authorities in Support of Petition.

| | | |
|---|---|---|
| (2) Did you raise this claim on direct appeal to the California Court of Appeal? | ☑Yes | ☐No |
| (3) Did you raise this claim in a Petition for Review to the California Supreme Court? | ☑Yes | ☐No |
| (4) Did you raise this claim in a habeas petition to the California Supreme Court? | ☐Yes | ☑No |

c. Ground three: The Court Violated Petitioner's 14th Amendment Due Process Rights by Failing to Instruct the Jury that the Prosecution

(1) Supporting FACTS: Must Prove Each Element BRD.

See attached Statement of the Case and Facts and Points and Authorities in Support of Petition

| | | |
|---|---|---|
| (2) Did you raise this claim on direct appeal to the California Court of Appeal? | ☑Yes | ☐No |
| (3) Did you raise this claim in a Petition for Review to the California Supreme Court? | ☑Yes | ☐No |
| (4) Did you raise this claim in a habeas petition to the California Supreme Court? | ☐Yes | ☑No |

d. Ground four: The Cumulative Effect of the Errors Violated Petitioner's Due Process Rights Under the 14th Amendment

(1) Supporting FACTS:

See attached Statement of the Case and Facts and Points and Authorities in Support of Petition.

| | | |
|---|---|---|
| (2) Did you raise this claim on direct appeal to the California Court of Appeal? | ☑Yes | ☐No |
| (3) Did you raise this claim in a Petition for Review to the California Supreme Court? | ☑Yes | ☐No |
| (4) Did you raise this claim in a habeas petition to the California Supreme Court? | ☐Yes | ☑No |

e. Ground five: Petitioner Was Deprived of His Sixth Amendment Right to Effective Assistance of Counsel when Counsel Failed to Move the

(1) Supporting FACTS: Court to Dismiss the Special Circumstances

See attached Statement of the Case and Facts and Points and Authorities in Support of Petition

| | | |
|---|---|---|
| (2) Did you raise this claim on direct appeal to the California Court of Appeal? | ☑Yes | ☐No |

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?   ☑Yes   ☐No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?   ☐Yes   ☑No

9. If any of the grounds listed in paragraph 8 were not previously presented to the California Supreme Court, state briefly which grounds were not presented, and give your reasons: _____N/A_____

_____

_____

10. Have you previously filed any habeas petitions in any federal court with respect to this judgment of conviction?

    ☐Yes   ☑No

    If so, give the following information for each such petition *(use additional pages, if necessary, and attach copies of the petitions and the rulings on the petitions if available):*

    a.   (1) Name of court: _____

         (2) Case number: _____

         (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing):* _____

         (4) Grounds raised *(list each):*

              (a) _____

              (b) _____

              (c) _____

              (d) _____

              (e) _____

              (f) _____

         (5) Date of decision: _____

         (6) Result _____

         _____

         (7) Was an evidentiary hearing held?   ☐ Yes ☐ No

    b.   (1) Name of court: _____

         (2) Case number: _____

         (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing):* _____

         (4) Grounds raised *(list each):*

              (a) _____

              (b) _____

              (c) _____

              (d) _____

              (e) _____

              (f) _____

         (5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?    ☐ Yes ☐ No

11. Do you have any petitions now pending (i.e., filed but not yet decided) in any state or federal court with respect to this judgment of conviction?    ☐ Yes ☑ No

If so, give the following information *(and attach a copy of the petition if available)*:

(1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

12. Are you presently represented by counsel?    ☐ Yes ☑ No

If so, provide name, address and telephone number: _____

_____

_____

WHEREFORE, petitioner prays that the Court grant petitioner all relief to which he may be entitled in this proceeding.

_____
*Signature of Attorney (if any)*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on   02-11-2025        _____
              *Date*                        *Signature of Petitioner*

*Marquece Lamar Hollingsworth*
_____
Petitioner

_____
Respondent(s)

**ELECTION REGARDING
CONSENT TO PROCEED BEFORE
A UNITED STATES MAGISTRATE JUDGE**

- A magistrate judge is available under 28 U.S.C. § 636(c) to conduct all proceedings in this case, including dispositive matters and entry of final judgment. However, a magistrate judge may be assigned to rule on dispositive matters only if all parties voluntarily consent.

- Parties are free to withhold consent to magistrate judge jurisdiction without adverse substantive consequences.

- If both parties consent to have a magistrate judge decide the case, any appeal would be made directly to the Ninth Circuit Court of Appeals, as if a district judge had decided the matter.

- Unless both parties consent to have a magistrate judge decide the case, the assigned magistrate judge will continue to decide only non-dispositive matters, and will issue a Report and Recommendation to the district judge as to all dispositive matters.

*Please check the "yes" or "no" box regarding your decision to consent to a United States Magistrate Judge and sign below.*

☑ Yes, I voluntarily consent to have a United States Magistrate Judge conduct all further proceedings in this case, decide all dispositive and non-dispositive matters, and order the entry of final judgment.

☐ No, I do not consent to have a United States Magistrate Judge conduct all further proceedings in this case.

Executed on ____02-11-2025____        _____
　　　　　　　　　　 Date　　　　　　　　　　　　　Signature of Petitioner/Counsel for Petitioner

## STATEMENT OF THE CASE

On September 17, 2021, appellant Marquece
Hollingsworth was charged by an amended information in Los
Angeles County with the murder of Frank Douglas (Pen. Code
§ 187, subd. (a), count 1), felony; one count of attempting to
dissuade a witness (§ 136.1, subd. (a)(2), count 3), felony; and
one count of assault by means of force likely to produce great
bodily injury (§ 245, subd. (a)(4), count 4)[1]. (2 CT 466-467.)

Count 1 was alleged to have been committed on or
about February 15, 2018. (2 CT 466.) Count 3 was alleged to
have been committed on or about February 7, 2018. (2 CT
467.) Count 4 was alleged to have been committed on or
about January 4, 2018. (2 CT 467.)

As to count 1, the information also charged appellant
with the "lying-in-wait" murder, and the murder of a witness
special allegations. (2 CT 466; §§ 190.2, subds. (a)(10) &
(a)(15).)

As to count 1, it was further alleged that appellant had
1) personally and intentionally discharged a firearm, causing
great bodily injury (§ 12022.53, subd. (d)); 2) personally and
intentionally discharged a firearm (§ 12022.53, subd. (c)); and
3) personally used a firearm (§ 12022.53, subd. (b)). (2 CT
466.)

As to counts 1 and 3, appellant was also charged with
an on-bail enhancement (§ 12022.1). (2 CT 467.)

---

[1] Although the section 245 violation was listed as count 4 in
the information, the court referred it as count 2 when it
instructed the jury.

As to count 4, it was also alleged that appellant had personally inflicted great bodily injury upon Frank Douglas (§ 12022.7, subd. (a)). (2 CT 467.)

Jury trial commenced on September 7, 2021. (2 CT 432.) On September 16, 2021, the court granted the defense motion to dismiss the section 12022.1 on-bail enhancement. (5 RT 2215.) On September 17, 2021, the jury returned guilty verdicts on all counts. (2 CT 538-542.) The jury returned true findings of all the special murder allegations in count 1 and the great bodily injury allegation in count 4. (2 CT 538, 539, 540, 541.) The jury found true the section 12022.53, subdivision (d) firearm allegation in count 1. (2 CT 538.)

On October 20, 2021, the court sentenced appellant to life without the possibility of parole consecutive to 31 years 8 months to life. (3 CT 579-582.)

For count 1, murder, the court sentenced appellant to life without the possibility of parole pursuant to section 190.2, subdivisions (a)(10) and (15), consecutive to 25 years to life for the personal use of a firearm enhancement. (3 CT 581.)

For count 4, assault by means of force likely to produce great bodily injury, the court sentenced appellant to the middle term of three years, and an additional three years for the great bodily injury allegation. (3 CT 579.)

For count 3, attempting to dissuade a witness, the court sentenced appellant to eight months (1/3 the middle term of two years), to be served consecutively with the sentence in count 4. (2 CT 579.) Various fines and fees were imposed. (2

CT 582.) On the same day, Mr. Hollingsworth filed a timely notice of appeal. (2 CT 578.)

On March 14, 2024, the California Court of Appeal, Second Appellate District, wrongfully affirmed petitioner's convictions. (Second Appellate District case No. B315845.) Petitioner then filed a Petition for Review in the California Supreme Court, case No. S284722. Review was denied on May 29, 2024.

The instant petition for writ of habeas corpus (28 U.S.C. § 2254 et. seq.) is properly before this Court, having noticed the state's highest court regarding the federalized issues raised herein and exhausted these remedies available by the state. (*McQuown vs. McCartney* (9th Cir. 1986) 795 F.2d 807, 809.) Additionally, petitioner is submitting a timely habeas petition pursuant to 28 U.S.C. § 2241 et. seq. and the 1996 Antiterrorism and Effective Death Penalty Act (AEDPA).

## STATEMENT OF FACTS

### I.    The Prosecution Case

Appellant Marquece Hollingsworth was the father of Katrina Arnold's daughter. (3 RT 1581, 1582.) Arnold met Mr. Hollingsworth in 2007 when they were in high school. (3 RT 1581.) Their daughter was born in December 2014. (3 RT 1582.) Arnold stopped living together with Mr. Hollingsworth in 2016 or 2017. (3 RT 1583.)

Arnold was also friends with Davion Jones and Deon Williams. (3 RT 1582.) Arnold, Jones, Williams and Mr. Hollingsworth all went to the same high school. (3 RT 1582.) Arnold and Jones had the same adopted father, Coach Smalls. (3 RT 1582; 4 RT 1882.) Coach Smalls lived near Arnold on 139th Street and San Pedro. (4 RT 1883.)

Arnold dated Frank Douglas in 2016, 2017, and 2018. (3 RT 1583.) Their relationship ended briefly in 2018, because Arnold still had an "on and off" relationship with Mr. Hollingsworth. (3 RT 1583.)

From October to December 2017, Arnold was having a sexual relationship with both Mr. Hollingsworth and Douglas. (3 RT 1584.) Mr. Hollingsworth and Douglas were aware that Arnold was seeing both of them. (3 RT 1584.)

Prior to January 2018, Mr. Hollingsworth and Douglas would see each other at school events and some family functions. (3 RT 1596, 1597.) They got along "perfectly well." (3 RT 1598.) They did not fight. (3 RT 1598.)

In January 2018, Mr. Hollingsworth confronted Arnold about Arnold seeing both men. (3 RT 1584.) Arnold told appellant she was happier with Douglas. (3 RT 1586.) Mr. Hollingsworth then made the decision to end the relationship with Arnold on January 2, 2018. (3 RT 1585.)

### A.     The January 4, 2018 School Incident (Count 4)

Tracey Washington was the principal at Locke Early Education and Infant Center. (3 RT 1511, 1512.) Both Mr. Hollingsworth and Douglas's daughters were students at the school. (3 RT 1518, 1519.) Appellant and Douglas would show up at school events at the same time. (3 RT 1553.) Washington did not notice any animosity between the two of them. (3 RT 1553.)

According to Washington, both Mr. Hollingsworth Douglas were great fathers. (3 RT 1519.) They would pick their daughters up and participated in school events. (3 RT 1519.) They were both very respectable and had no prior problems with the school. (3 RT 1519.)

Mr. Hollingsworth would usually pick up his daughter about 4:00 p.m. and Douglas would pick up his daughter about 5:00 p.m. (3 RT 1518, 1520.) Douglas would occasionally pick up appellant's daughter from the school. (3 RT 1552.) There were never any complaints from appellant. (3 RT 1552.)

On January 4, 2018, about 5:00 p.m., Washington was working at the school office. (3 RT 1512.) At the office counter, there was a clipboard with sign-out sheets where

parents would sign out when they picked their children up. (3
RT 1512-1513.) Both Mr. Hollingsworth and Douglas were
there signing their daughters out. (3 RT 1521.)

Mr. Hollingsworth signed out first, then Douglas
stepped up to the counter to sign out. (3 RT 1521.) When
Washington turned and looked to her left to say goodbye to
her staff, she heard someone say "Stop, Stop," in the foyer
area of the office. (3 RT 1522.) She saw appellant pushing
Douglas with his elbow and Douglas fell backward onto a
chair against a wall. (3 RT 1523, 1524.)

Then Washington saw both appellant and Douglas fell
over the chairs toward the door. (3 RT 1524.) Appellant was
on top of Douglas, hitting Douglas's head and face with his
fists. (3 RT 1524, 1525.) Douglas got into a fetal position and
started covering his head. (3 RT 1525.) Washington yelled
"Hey, Stop," but no one stopped. (3 RT 1524.) Appellant hit
Douglas at least three times. (3 RT 1525.)

Washington called 9-1-1 and the school police. (3 RT
1524, 1526.) When Washington was talking to the 9-1-1
operator, appellant stopped and put his right hand into the
big front pocket of the hoodie that he was wearing. (3 RT
1526, 1527.) Then appellant stood up over Douglas and
kicked Douglas in the head and stomped Douglas three times.
(3 RT 1532.) The fight went on for about two and a half
minutes. (3 RT 1531.) Washington only saw appellant hitting
Douglas. (3 RT 1531.) Appellant then went through the door
to pick up his daughter. (3 RT 1533.)

Douglas was not moving and he did not appear to be conscious, according to Washington. (3 RT 1535.) There was blood splattered against the plexiglass and the glass door. (3 RT 1536.) One of Douglas's eyes was shut. (3 RT 1538.) There was blood coming from the back of his head and one of his eyes. (3 RT 1539.)

About five to six minutes later, Douglas started to get up. (3 RT 1537.) Douglas asked for his daughter. (3 RT 1538.) A staff member brought his daughter to him even though Washington did not think Douglas was in any condition to go anywhere. (3 RT 1538.) Douglas then left the school with his daughter. (3 RT 1538.)

On January 4, 2018, Arnold saw Douglas after 5:00 p.m. (3 RT 1586.) Douglas's face was swollen and bleeding. (3 RT 1587.) One of his eyes was bleeding. (3 RT 1587.) Arnold accompanied Douglas to the hospital the next day. (3 RT 1587.) The hospital would not treat Douglas until the police responded and took a report. (3 RT 1642.) Douglas was hesitant to speak to the police. (3 RT 1642.)

Douglas's testimony at the February 7, 2018 preliminary hearing regarding this school incident was read to the jury at the instant trial pursuant to Evidence Code section 1291, subdivision (a)(2). (2 RT 4; 3 RT 1569, 1624.)

Douglas testified that when he went to pick up his daughter at school on January 4, 2018, appellant shoulder-bumped Douglas, and Douglas bumped him back. (3 RT 1624.) They exchanged words and had a stare off. (3 RT 1624.) When Douglas turned to walk away, he felt something

hit him in the back of his head. (3 RT 1626.) When he woke
up, he could not remember what happened. (3 RT 1626.)
Douglas went to the hospital the next day and was admitted
to the hospital. (3 RT 1626.)

He stayed at the hospital for two days. (3 RT 1626.)
Douglas had a cut on his right eye and a laceration on the
right side of his head. (3 RT 1627.) He had stitches and also
had to have surgery on his eye to repair an orbital fracture. (3
RT 1628, 1633.)

### B.    The February 7, 2018 Preliminary Hearing (Count 3)

Monique Watson was the mother of Douglas. (3 RT
1634, 1635.) On February 7, 2018, Douglas came to court to
testify at the preliminary hearing regarding the incident at the
school. (3 RT 1643.) Watson came with him. (3 RT 1643.)
They waited inside the courtroom until the proceeding
started. (3 RT 1643.) They sat on the left side of the
courtroom. (3 RT 1643.) Appellant sat on the right side. (3 RT
1644.)

At some point, a 6-foot tall, big "stalky" African-
American male walked in. (3 RT 1645.) Watson identified the
individual as Davion Jones. (4 RT 1843.) Jones asked
appellant: "Where is he at?" (3 RT 1645.) Appellant told him:
"Go sit over there. He over there." (3 RT 1645.) Appellant
pointed to where Watson and Douglas were sitting. (3 RT
1645.) Jones then sat behind Watson and Douglas, even
though there were opened seats next to appellant. (3 RT

1647; 4 RT 1843.) Jones sat quietly during the entire proceeding. (4 RT 1845.)

Another African-American male, about 5 foot 7 inches tall with smaller frame, came in. (3 RT 1648.) Watson identified that person as Deon Williams. (4 RT 1845.) Williams looked at appellant and then sat in the middle section, on the aisle seat on Watson's side. (3 RT 1648; 4 RT 1845.) Williams also sat quietly during the proceeding. (4 RT 1846.)

There was a third person with dreadlocks that came in and sat behind Watson and Douglas. (3 RT 1649; 4 RT 1846, 1847.) Watson testified that she did not know whether that person was associated with appellant at all. (4 RT 1847.) Watson alerted the district attorney and Watson and Douglas left the courtroom to wait in another room. (3 RT 1650; 4 RT 1847.)

The prosecutor played the video recording of the courtroom security camera for the jury. The recording showed appellant might have taken a picture of Douglas. (4 RT 1854.)

On February 9, 2018, Arnold and appellant's mutual friend Deon Williams posted a photograph on Instagram and tagged Arnold. (3 RT 1588.) The photograph showed Williams sitting in close proximity to Douglas in the courtroom at the preliminary hearing. (3 RT 1588.)

## C.    The February 15, 2018 Incident (Count 1)

On February 14, 2018, Valentine's Day, Mr. Hollingsworth stopped by Arnold's house to drop off a Valentine's gift for his daughter. (3 RT 1590.) Mr. Hollingsworth stayed briefly and left before Douglas came to

the house. (3 RT 1591, 1607.) Douglas picked up Arnold's daughter from school and came to Arnold's house after 5:00 p.m. (3 RT 1590.)

Douglas stayed at Arnold's for dinner and spent the night. (3 RT 1591.) Arnold did not tell Mr. Hollingsworth her plan for the night. (3 RT 1606.)

On February 15, 2018 about 5:30 a.m., Tiandre Reshard was in the area of 139th Street and San Pedro, near Arnold's house. (4 RT 1804, 1805.) He was on his way to work and had to put air in his tire. (4 RT 1805.) It was dark outside. (4 RT 1806.) Reshard saw a person in dark clothing in the alley. (4 RT 1806.) The person was wearing a black hoodie and dark pants. (4 RT 1807.) Under cross-examination, Reshard stated the person was wearing black fitted jeans. (4 RT 1830.) The person had the hoodie on over the person's head. (4 RT 1807.) Reshard was about 42 feet away from the person when Reshard saw the person. (4 RT 1811.)

Reshard then circled around the block and drove his car through the alley again. (4 RT 1809, 1811, 1812.) Reshard saw the same person standing in the alley, bending down and ducking. (4 RT 1813.) Reshard had tinted windows in his car, but he saw the person on the passenger side of his car. (4 RT 1814.) Reshard stopped his car for 5 to 10 seconds to look at the person. (4 RT 1817.) The person never got up to look at Reshard. (4 RT 1817.) The person had dark complexion. (4 RT 1828.) The person was thin and short. (4 RT 1829.) The

10

person did not duck behind the trash cans or dumpsters in
the alley. (4 RT 1830.)

Reshard did not know Davion Jones and did not speak
with Jones. (4 RT 1822.) Other than the police, Reshard only
told his family about seeing this person in dark clothing. (4
RT 1822.)

Just before Reshard saw the person in dark clothing,
Reshard also saw a man carrying two bags to his car. (4 RT
1820-1821.) Under cross-examination, Reshard also testified
that he saw three individuals sitting in a car parked on San
Pedro. (4 RT 1826.)

On February 15, 2018, Douglas was at Arnold's house
and got up about 5:00 a.m. to go to work. (3 RT 1591.)
Douglas left Arnold's house about 5:50 a.m. to go to work. (3
RT 1591.) Arnold got up to see him off, then went back to
bed. (3 RT 1592.)

Arnold then heard gunshots and she started calling
Douglas's cellular phone. (3 RT 1592.) Arnold called Douglas
several times but he did not pick up. (3 RT 1593.)

Arnold then looked out the window and saw Douglas'
car parked with the headlights on. (3 RT 1593.) Arnold went
to Douglas' car and saw holes in the window. (3 RT 1595.)
Arnold opened the car door and saw Douglas slumped over
the steering wheel. (3 RT 1595.)

Arnold never disclosed Douglas' work schedule to
appellant. (3 RT 1599.) Arnold lived with Mr. Hollingsworth's
sister Lashaya and her boyfriend. (3 RT 1600, 1601.) Lashaya
and her boyfriend left the house earlier than Douglas on

February 15, 2018. (3 RT 1601.) They did not mention seeing Mr. Hollingsworth near the house in the alleyway. (3 RT 1601.)

### D.     The Police Investigation

Detective Eduardo Aguirre was one the investigating officers that investigated the murder of Douglas. (5 RT 2137, 2138.) From the beginning, appellant was a "person of interest." (5 RT 2151.)

The police created a police bulletin related to the murder in this case. (4 RT 1938; 5 RT 2152, 2154.) The sketch of the murder suspect in the bulletin resembled Deon Williams. (4 RT 1939.) Aguirre stated that the sketch on the police bulletin that resembled Deon Williams was just a "ruse." (5 RT 2152, 2154.) It was not based on any eyewitness description. (5 RT 2152.) The bulletin did not contain any information about what clothing the suspect was wearing. (5 RT 2153.) The bulletin was put together before the police talked to Reshard. (5 RT 2153.)

The bulletin was intended for appellant and his close associates so it would get people "to start talking, start worrying, start panicking." (5 RT 2155.)

In January 2019, Davion Jones was at Williams' arraignment on the witness intimidation case related to this case. (5 RT 2157, 2178.) After the arraignment, Aguirre followed Jones to his place of employment. (5 RT 2179.) Aguirre let Jones know that the police was possibly looking at charging Jones with witness intimidation, just like Williams. (5 RT 2157.)

The police found multiple nine-millimeter cartridge
casings at the crime scene. (5 RT 2141, 2142, 2143, 2144.)
The parties stipulated that Douglas died from multiple
gunshot wounds. (5 RT 2200.) The bullets used were
commonly loaded in nine-millimeter Luger caliber cartridges.
(5 RT 2202.)

As part of the investigation, Aguirre obtained records
from Mr. Hollingsworth's phone. (5 RT 2183.) Aguirre also
wiretapped Mr. Hollingsworth's and Davion Jones' phones for
four to six months. (5 RT 2151, 2155, 2184.) In all the text
messages and phone conversations, Mr. Hollingsworth never
admitted to participating or committing the murder of
Douglas. (5 RT 2183, 2184.)

There were multiple surveillance cameras at Mr.
Hollingsworth's apartment complex. (5 RT 2187.) The police
retrieved videos from the cameras. (5 RT 2187.) The police did
not obtain any videos of Mr. Hollingsworth leaving his
apartment prior to 5:30 a.m. on February 15, 2018. (5 RT
2192.)

### E.    Testimony of Davion Jones

Davion Jones had known Katrina Arnold since ninth
grade. (4 RT 1881.) They had the same adopted father, Coach
Smalls. (4 RT 1882.) Davion Jones met Deon Williams in
tenth grade and had known Mr. Hollingsworth since high
school. (4 RT 1880-1881, 1883.)

Jones and Mr. Hollingsworth had been close friends for
over 14 years. (4 RT 1881.) They communicated with each

other every day or every other day, either face to face, via
telephone or text messages. (4 RT 1881.)

According to Jones, he saw appellant with a gun at a
2017 New Years' Eve party. (4 RT 1911.) It was a nine-
millimeter gun. (4 RT 1912.)

Appellant told Jones about the fight at the school on
January 4, 2018. (4 RT 1884, 1886.) Appellant asked Jones
to show up for appellant's court appearance related to the
school fight on February 7, 2018. (4 RT 1888.) Appellant
texted Jones that day and told Jones not to sit by appellant.
(4 RT 1888.)

Appellant also texted Jones and asked Jones to "act like
you don't know me." (4 RT 1890.) When Jones walked into the
courtroom, appellant waved to him to sit on the side where
Douglas was sitting. (4 RT 1891.) At the time of the February
7, 2018 preliminary hearing, Jones had not met Douglas
before and did not know what he looked like. (4 RT 1922.)

Appellant waved to Jones to let him know not to sit
behind appellant. (4 RT 1922.) Appellant did not tell Jones to
sit next to Douglas. (4 RT 1922.) Appellant just said "Don't sit
next to me. Sit over there." (4 RT 1922.) Jones just chose a
random seat behind Douglas and Watson. (4 RT 1923.)

Jones and Mr. Hollingsworth never talked about the
preliminary hearing afterwards. (4 RT 1891.) Mr.
Hollingsworth never expressed any anger or resentment
towards Douglas because of his preliminary hearing
testimony. (4 RT 1891.)

In February 2018, Jones worked from 3:00 p.m. to 11:00 p.m. and he would go to the 24-Hour Fitness gym in Manhattan Beach after work. (4 RT 1892.) He would work out from 11:30 p.m. to 1:30 a.m. (4 RT 1892, 1893.) Jones would wake up about 10:00 a.m. (4 RT 1893.)

Jones frequently worked out with Mr. Hollingsworth. (4 RT 1892.) Jones would work out with appellant from 11:30 p.m. to 1:30 a.m. two to three times a week. (4 RT 1893.)

On February 15, 2018[2], about 6:40 a.m. to 6:50 a.m., Jones was awaken by a knock on his door. (4 RT 1895.) Appellant was at the door. (4 RT 1896.) It was not typical for appellant to show up early unannounced. (4 RT 1896.)

Appellant was wearing a black hooded pullover sweatshirt and black sweat pants. (4 RT 1897, 1899.) Appellant acted "a little rushed," talking a little fast and seemed nervous. (4 RT 1897, 1898.)

Mr. Hollingsworth asked Jones to give him a call if he wanted to work out. (4 RT 1899.) Then he left. (4 RT 1899.)

Mr. Hollingsworth lived about five to 10 minutes from Jones. (4 RT 1899.) Jones then got ready and went to pick Mr. Hollingsworth up from his house. (4 RT 1902.)

While they were on their way to the gym, Coach Smalls texted Jones and told him Douglas was killed and told Jones to stay away from Coach Smalls' house. (4 RT 1904.) Arnold lived two doors down from Coach Smalls. (4 RT 1905.)

---

[2] Although the prosecutor stated "on the morning of February the 14th" when he was questioning Jones (4 RT 1895), from the context of the questioning, the prosecutor was referring to the morning of February 15, 2018.

When Coach Smalls' text came in, Hollingsworth looked at Jones' phone then turned away. (4 RT 1905.) While they were at the gym, Jones got a call from his cousin. (4 RT 1906.) His cousin told him the area around Coach Small's house was roped off. (4 RT 1906.)

Jones then asked appellant "what's going on." (4 RT 1907.) Appellant told Jones "he got him." (4 RT 1908.) According to Jones, appellant told him appellant was in the alley by a trash can. (4 RT 1908.) Appellant was wearing a sweatshirt and he tightened the drawstrings around the hood so no one could see him. (4 RT 1908-1909.) Appellant turned away so "the guy across the street" could not see him. (4 RT 1910.) Appellant crouched down by a trash can. (4 RT 1910.) Appellant crouched down so the neighbor could not see him. (4 RT 1909.)

According to Jones, appellant waited for Douglas to come out before he shot him. (4 RT 1910.) Appellant ran across the street and shot Douglas through the car window. (4 RT 1909, 1910.)

Deon Williams was one of Jones' good friend. (4 RT 1912.) Jones had known Williams longer than he had known Mr. Hollingsworth. (4 RT 1939.) Williams was a very close childhood friend. (4 RT 1939.) Williams was charged with witness intimidation in connection to this case. (4 RT 1912, 1934.) Jones attended Williams' court appearance. (4 RT 1913.) After the court appearance, the police followed Jones to his place of employment. (4 RT 1935.)

The police talked to Jones and told Jones he was next to
be charged. (4 RT 1913.) The police also gave Jones a police
bulletin related to the murder in this case. (4 RT 1938.) The
sketch of the murder suspect in the bulletin resembled Deon
Williams. (4 RT 1939.) The police told Jones he better come
see us. (4 RT 1941.) Jones was next to be charged. (4 RT
1941.) After being threatened by the police, Jones was
worried about being next, just like Williams. (4 RT 1941.)

The police's statement influenced Jones to speak to the
police. (4 RT 1913.) Jones was interviewed by the police on
January 15, 2019. (4 RT 1934.)

Jones was interviewed by the police 11 months after
appellant allegedly confessed to Jones at the gym, after the
police threatened Jones with prosecution. (4 RT 1942.)
During interview, the police told Jones that Williams might be
facing life in prison. (4 RT 1944.) The police asked Jones if he
wanted to help himself out. (4 RT 1943.) Jones was worried
that he might also be facing life in prison. (4 RT 1944.)

Prior to the January 15, 2019 police interview, Jones
was "intimately familiar with the facts of this incident." (4 RT
1945.) Jones had lived in the area of the incident. (4 RT
1945.) He was familiar with the alleyway and the trash can in
the alleyway. (4 RT 1945, 1946.) Jones had seen the police
bulletin, and a television news report of the shooting. (4 RT
1945.) Jones knew the weight, shape, and age of the suspect.
(4 RT 1945.) Jones also knew the suspect was wearing a
hoodie. (4 RT 1945.)

Appellant never expressed any resentment toward Douglas, either before or after the school fight. (4 RT 1923.)

Jones continued to socialize with Mr. Hollingsworth even after he allegedly confessed to the murder. (4 RT 1968.) Between the day of the incident and when Jones was interviewed by the police, Jones and Mr. Hollingsworth exchanged hundreds of text messages. (4 RT 1968.) They never discussed the murder. (4 RT 1968.)

## II.    The Defense case

It was the defense theory that the evidence against Mr. Hollingsworth was purely circumstantial and weak. (5 RT 2464.) Mr. Hollingsworth and Douglas did not have any conflicts when they were at family functions and school events together. (5 RT 2466.)

Mr. Hollingsworth did not know Douglas' schedule. (5 RT 2466.) Mr. Hollingsworth's fight with Douglas at the school was not sufficient motive to kill since appellant got the upper hand. (5 RT 2467, 2469.) There was no DNA, no physical evidence linking Mr. Hollingsworth to the killing. (5 RT 2469.)

Although there were multiple surveillance cameras at Mr. Hollingsworth's apartment complex, there was no video showing Mr. Hollingsworth leaving his apartment at any time on the morning of February 15, 2018 prior to the murder. (5 RT 2471.)

It was highly unlikely appellant would have told Jones all the specifics regarding the murder if appellant had

allegedly made all the efforts to conceal himself as Reshard testified. (5 RT 2473.)

Jones lied about the early morning meeting with appellant on February 15, 2018. (5 RT 2472.) Jones lied and told the police what the police wanted to hear to get himself out of trouble. (5 RT 2476.) Jones might have gotten the details regarding the murder suspect from Coach Smalls or Arnold. (5 RT 2477.)

## POINTS AND AUTHORITIES IN SUPPORT OF PETITION

I.   **THE TRIAL COURT COMMITTED PREJUDICIAL ERROR AND VIOLATED APPELLANT'S DUE PROCESS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS WHEN IT FAILED TO SUA SPONTE INSTRUCT THE JURY THAT DAVION JONES WAS AN ACCOMPLICE AND IT SHOULD VIEW HIS STATEMENTS WITH CAUTION.**

### A.   Introduction

In the opening brief (AOB 30-37), appellant argued that the trial court erred when it failed to sua sponte instruct the jury that Jones was an accomplice and that the jury should view Jones' statements with caution. The trial court should have sua sponte instructed the jury with CALJIC Nos. 3.10, 3.11, 3.12, 3.18, and 3.19. The trial court should have instructed the jury to determine whether Jones was an accomplice, and if so, to treat his statements with caution and to credit his statements implicating appellant in the murder and dissuading the witness counts only if they were corroborated.

The Court of Appeal held that "the evidence was insufficient as a matter of law to find that Jones was an accomplice to the murder," and the trial court did not err. (Slip. opn. at p. 12.)

The Court of Appeal overlooks the fact that a finding a person is an accomplice is made based on the preponderance of the evidence, *a significantly lower burden* than the proof beyond a reasonable doubt required for a criminal conviction. (*People v. Belton* (1979) 23 Cal.3d 516, 523-524.)

During the preliminary hearing on March 22, 2021, Detective Aguirre testified that Davion Jones and Deon Williams were both "people of interest" in the present case. (1 CT 184.) The search warrants labeled them as "coconspirators." (1 CT 185.) Aguirre opined that both Jones and Williams "at one point they may have participated in a manner" in the present case. (1 CT 187.) Jones was a potential suspect in the case. (1 CT 187.)

Williams was charged with dissuading a witness based on his conduct at Mr. Hollingsworth's February 7, 2018 preliminary hearing. (1 CT 187-188.) Aguirre also filed a police report with the District Attorney's office requesting that charges be filed against Jones on dissuading a witness, the same offense appellant was charged with in count 3. (1 CT 187; 2 CT 466-467.)

During trial, Aguirre testified that Jones and Williams were appellant's "associates" and the police wiretapped their phones. (5 RT 2151, 2155, 2157, 2163, 2175, 2184.)

Also, Aguirre told the jury the police created a bulletin with the sketch of a murder suspect that resembled Deon Williams. (5 RT 2152, 2154.) The bulletin was intended for appellant and his close associates so it would get people "to start talking, start worrying, start panicking." (5 RT 2155.) Thus, the jury could have reasonably concluded that Jones might have been an aider and abettor or "member of a criminal conspiracy" (CALJIC No. 3.10) in the murder since the police believed that Jones was an associate of appellant and he had information regarding the murder.

The trial court should have sua sponte instructed the
jury with CALJIC Nos. 3.10, 3.11, 3.12, 3.18, and 3.19. The
trial court should have instructed the jury to determine
whether Jones was an accomplice, and if so, to treat his
statements with caution and to credit his statements
implicating appellant in the murder and dissuading the
witness counts only if they were corroborated.

Thus, the Court of Appeal opinion was an unreasonable
application of clearly-established federal law. (U.S. Const.,
14th Amend.; 28 U.S.C. § 2254(d)(1); *Williams v. Taylor,
supra,* 529 U.S. 362, 405; *In re Winship, supra,* 397 U.S. 358,
364; *Jackson v. Virginia, supra,* 443 U.S. 307, 319.)

> **B.    The Court Failed to Instruct the Jury to
> Determine Whether Davion Jones Was An
> Accomplice and to Treat His Statements
> Accordingly.**

"It is settled that a court must instruct sua sponte on
general principles of law that are closely and openly
connected with the facts of the case." (*People v. Marquez*
(1992) 1 Cal.4th 553, 581.) This Court has held that such a
sua sponte duty arises "whenever the testimony given upon
the trial is sufficient to warrant the conclusion upon the part
of the jury that a witness implicating a defendant was an
accomplice." (*People v. Bevins* (1960) 54 Cal.2d 71, 76; *People
v. Zapien* (1993) 4 Cal.4th 929, 982.)

More specifically, "[i]f there is evidence that a witness
against the defendant is an accomplice, the trial court must
give jury instructions defining 'accomplice.' . . . It also must
instruct that an accomplice's incriminating testimony must

22

be viewed with caution . . . and must be corroborated . . . ."
(*People v. Felton* (2004) 122 Cal.App.4th 260, 267-268; *People
v. Zapien*, *supra*, 4 Cal.4th 929, 982.)

A witness's status as an accomplice is determined by a
preponderance of the evidence, whether introduced by the
prosecution or the defense. (See *People v. Belton* (1979) 23
Cal.3d 516, 523-524.)

"For instructional purposes, an accomplice is a person
'who is liable to prosecution for the identical offense charged
against the defendant on trial in the cause in which the
testimony of the accomplice is given.' [Citations.]" (*People v.
Arias* (1996) 13 Cal.4th 92, 142-143, quoting Pen. Code, §
1111.) "In order to be an accomplice, the witness must be
chargeable with the crime as a principal [citation] and not
merely as an accessory after the fact [citations]. [Citation.]"
(*People v. Sully* (1991) 53 Cal.3d 1195, 1227.) Principals
include those who "directly commit the act constituting the
offense" as well as those who "aid and abet in its commission.
. . ." (Pen. Code, § 31.) Accordingly, aiders and abettors are
accomplices within the meaning of section 1111. (See *People
v. Belton*, *supra*, 23 Cal.3d 516, 523.) Further, "[o]ne who is a
party to a conspiracy and active in carrying out its object is
an accomplice. [Citations.] In order to come within the
definition of an accomplice a person must have guilty
knowledge and intent with regard to the commission of the
crime." (*People v. Jones* (1964) 228 Cal.App.2d 74, 94,
citations omitted.)

A finding a person is an accomplice is made based on the preponderance of the evidence, a significantly lower burden than the proof beyond a reasonable doubt required for a criminal conviction. (*People v. Belton, supra*, 23 Cal.3d 516, 523-524.)

As discussed above, the police called Jones a "coconspirator," "an associate" of appellant. There was substantial evidence that Jones was an aider and abettor in the dissuading the witness count. Using the preponderance of the evidence standard, there is a reasonable possibility one or more jurors analyzing the evidence would have concluded Jones was a co-conspirator and aider and abettor in both the murder and the dissuading the witness counts, thereby triggering the need to treat Jones' statements with caution and to find corroboration for Jones' implication of appellant in the offenses.

### C.   The Error Was Prejudicial and Reversal Is Required.

The court's failure to instruct the jury on accomplice testimony allowed appellant to be convicted of murder based on the uncorroborated testimony of a witness a juror could reasonably find was an accomplice, a witness who had an interest in using his knowledge of what happened to implicate appellant and lessen the culpability of himself.

The lack of accomplice instructions allowed the prosecution to secure convictions in counts 1 and 3 without the corroboration required by Penal Code section 1111 and the caution required by California law. (*People v. Guiuan*

(1998) 18 Cal.4th 558, 569; *People v. Wallin* (1948) 32 Cal.2d
803, 808.) In this way, the court's error effectively lightened
the state's burden of proof and violated appellant's federal
constitutional right to due process and a jury trial. (See
*Carella v. California* (1989) 491 U.S. 263, 265 [jury
instructions lessening state's burden of proof "subvert the
presumption of innocence accorded to accused persons and
also invade the truth-finding task assigned solely to juries in
criminal cases"]; U.S. Const., Amends. 6 & 14.)

An error of federal constitutional magnitude requires
reversal unless the prosecution can show the error was
harmless beyond a reasonable doubt. (*Chapman v. California*
(1967) 386 U.S. 18, 24.) The appropriate inquiry is "not
whether, in a trial that occurred without the error, a guilty
verdict would surely have been rendered, but whether the
guilty verdict actually rendered in this trial was surely
unattributable to the error." (*Sullivan v. Louisiana* (1993) 508
U.S. 275, 279, italics in original.)

In addition, the court's failure to properly instruct the
jury improperly denied appellant application of this state's
own criminal procedure rules in violation of due process
principles under the Fourteenth Amendment. (See *Hicks v.
Oklahoma* (1980) 447 U.S. 343, 346 [arbitrary deprivation of
state law right violates due process]; *People v. Marshall* (1996)
13 Cal.4th 799, 850-851.)

A trial court's failure to give the required *cautionary*
instruction regarding accomplice testimony is reviewed under
the standard of prejudice prescribed by *People v. Watson*

(1956) 46 Cal.2d 818, 836: reversal is required when there is
a reasonable probability of an outcome more favorable to the
defendant if the instruction had been given. (*People v. Dickey*
(2005) 35 Cal.4th 884, 905.)

Appellant contends that reversal is required under
either the *Chapman* or *Watson* standard.

Given the state of evidence in this case, there is a
reasonable chance of a better result for appellant had the jury
been told to determine whether Jones was an accomplice and
if so, to treat his statements with caution.

Had the jury been properly instructed on accomplice
testimony, they would have been told:

"To the extent that an accomplice gives testimony that
tends to incriminate the defendant, it should be viewed with
caution. This does not mean, however, that you may
arbitrarily disregard that testimony. You should give that
testimony the weight you think it deserves after examining it
with care and caution and in light of all the evidence in this
case." (CALJIC No. 3.18.)

Such an instruction would have further weakened the
prosecutor's case against Mr. Hollingsworth, which was
heavily dependent on Jones' statements.

Jones was the only one who testified that appellant told
him to show up at the February 7, 2018 preliminary hearing.
(4 RT 1888.) Jones was the only witness who said appellant
confessed to shooting Douglas. (4 RT 1908.) Jones testified
that on the morning of February 15, 2018, appellant was
wearing dark clothing with a hoodie, which matched

Reshard's description of the person in the alley. (4 RT 1897,
1899.) Jones's statement was the only evidence that
connected appellant to the murder.

Without Jones' statements, the prosecutor's case
against appellant in counts 1 and 3 would collapse.

However, Jones' credibility was dubious. Jones did not
show any concern when he heard that his adopted sister's
boyfriend was murdered in his adopted father's
neighborhood. Jones continued to go to the gym after hearing
the news of the murder.

Jones was "intimately familiar with the facts of this
incident." (4 RT 1945.) Jones had lived in the area of the
incident. (4 RT 1945.) He was familiar with the alleyway and
the trash can in the alleyway. (4 RT 1945, 1946.) Jones had
seen the police bulletin, and a television news report of the
shooting. (4 RT 1945.) Jones knew the weight, shape, and age
of the suspect. (4 RT 1945.) Jones also knew the suspect was
wearing a hoodie. (4 RT 1945.)

It was highly unlikely appellant would have told Jones
all the specifics regarding the murder if appellant had
allegedly made all the efforts to conceal himself as Reshard
testified. (5 RT 2473.) Jones only talked to the police after the
police threatened to charge him with a crime. (4 RT 1913,
1941.) Jones might have lied and told the police what the
police wanted to hear to get himself out of trouble. (5 RT
2476.) Jones might have gotten the details regarding the
murder suspect from Coach Smalls or Arnold. (5 RT 2477.)

For all these reasons, a reasonable juror would have
cause to question Jones' credibility. There is a reasonable
likelihood that one or more jurors, having been properly
instructed to determine whether Jones was an accomplice,
would apply sufficient caution to Jones' testimony to tip the
balance against crediting him and his implication of
appellant.

Since a reasonable juror could have found a
preponderance of the evidence established Jones was an
accomplice, and since there is a reasonable possibility the
consequent treatment of his testimony with caution would
have resulted in a rejection of his implication of appellant in
counts 1 and 3, the lack of accomplice instructions as to
Jones requires reversal of the convictions for a new trial.

Therefore, the omission of the accomplice instructions
was not harmless. This Court should grant review to remedy
this wrong. Thus, the Court of Appeal opinion was an
unreasonable application of clearly-established federal law.
(U.S. Const., 14th Amend.; 28 U.S.C. § 2254(d)(1); *Williams v.
Taylor, supra,* 529 U.S. 362, 405; *In re Winship, supra,* 397
U.S. 358, 364; *Jackson v. Virginia, supra,* 443 U.S. 307, 319.)

## II. THE CONVICTION IN COUNT 3 SHOULD BE REVERSED BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO CORROBORATE THE ACCOMPLICE TESTIMONY, IN VIOLATION OF PENAL CODE SECTION 1111 AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.

### A. Introduction

Mr. Hollingsworth was charged in count 3, attempting to dissuade a witness from testifying. (§ 136.1, subd. (a)(2); 2 CT 466-467.) The charge was based on Mr. Hollingsworth allegedly asking Jones and Williams to show up at appellant's February 7, 2018 preliminary hearing to intimidate Douglas.

The jury was instructed with CALJIC No. 7.14, which states that the defendant must have "acted knowingly and maliciously." (2 CT 507.)

In his closing argument, the prosecutor told the jury appellant was guilty of attempting to dissuade a witness because "he acted knowingly and maliciously." (5 RT 2456.) The prosecutor argued: "And how do we know he acted knowingly and maliciously? . . . Again, you were texting your friends to come support you. And then when you get there, he texts you, act like you don't know me." (5 RT 2456.)

Thus, the prosecutor was arguing that Mr. Hollingsworth had the specific intent to attempt to dissuade based on Jones' testimony that Mr. Hollingsworth purposely asked Jones and Williams to show up at the preliminary hearing.

Without Jones' testimony, the prosecutor would be unable to prove that appellant acted "knowingly and

maliciously." There was no other evidence corroborating
Jones' testimony that Mr. Hollingsworth asked Jones and
Williams to show up at the preliminary hearing for the
purpose of intimidating Douglas.

As discussed in the opening brief (AOB 30-37) and in
Argument II above, Jones was an accomplice since it was the
prosecution's theory that Jones was aiding and abetting
appellant in attempting to dissuade Douglas from testifying.
Since there was no credible, independent evidence
corroborating the accomplice testimony pointing to Mr.
Hollingsworth having the specific intent required in count 3,
dissuading a witness, the conviction in count 3 should be
reversed. (§ 1111; *People v. Romero and Self* (2015) 62 Cal.4th
1, 32, 36 ["under section 1111, the corroboration must
connect the defendant to the crime *independent* of the
accomplice's testimony"]; emphasis in original.)

## B.      The Requirement of Corroboration for
### Accomplice Testimony

It has long been the rule in California, as under the
Common Law, that accomplice testimony must be sufficiently
corroborated by independent evidence. (See *People v.
Manibusan* (2013) 58 Cal.4th 40, 93; *People v. Tewksbury*
(1976) 15 Cal.3d 953, 967; *People v. Kempley* (1928) 205 Cal.
441, 485.)

"The requirement that accomplice testimony be
corroborated is an exception to the substantial evidence rule.
It is based on the Legislature's determination that because of
the reliability questions posed by accomplice testimony, such

testimony by itself is insufficient as a matter of law to support a conviction." (*People v. Romero and Self, supra*, 62 Cal.4th 1, 32; court's insertion, citations and internal quotation marks omitted.) "Thus, for the jury to rely on an accomplice's testimony about the circumstances of an offense, it must find evidence that without aid from the accomplice's testimony, tend[s] to connect the defendant with the crime. [Citations.]" (*Ibid.*, internal quotations omitted.)

Accomplice testimony must be viewed "with care, caution and suspicion because it comes from a tainted source and is often given in the hope or expectation of leniency or immunity." (*People v. Wallin* (1948) 32 Cal.2d 803, 808; accord *People v. Tewksbury, supra,* 15 Cal.3d at p. 967; *People v. Gonzales & Solis* (2011) 52 Cal.4th 254, 303.) It is in the accomplice's best interest to shift blame onto the defendant and minimize his or her own culpability." (*People v. Tobias* (2001) 25 Cal.4th 327, 331; see also *People v. Guian* (1998) 18 Cal.4th 558, 571-576 [conc. opn. of Kennard, J., explaining the reasons for the historical distrust of accomplice testimony].)

Although accomplice testimony is unreliable, it "is frequently cloaked with a plausibility which may interfere with the jury's ability to evaluate [its] credibility." (*People v. Tewksbury, supra*, 15 Cal.3d at p. 967.)

As this Court explained in *Tewksbury*: "[An] accomplice is not merely a witness with a possible motive to tell lies about an innocent accused but is such a witness peculiarly equipped, by reason of his inside knowledge of the crime, to

convince the unwary that his lies are the truth." (*Ibid.*, court's insertion, citations and internal quotation marks omitted; see also *People v. Guian, supra*, 18 Cal.4th at 575 [conc. opn. of Kennard, J.: "special caution is warranted because an accomplice's firsthand knowledge of the details of the criminal conduct allows for the construction of plausible falsehoods not easily disproved"].)

The evidence corroborating an accomplice's testimony may be entirely circumstantial, slight, and entitled to little consideration when standing alone. However, it is only sufficient if, without aid or assistance from the testimony of the accomplice, it tends to implicate the defendant. The accomplice's testimony must be sufficiently substantiated so as to establish his credibility and satisfy the jury that he is telling the truth. (*People v. Williams* (1997) 16 Cal.4th 153, 246; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1128; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1206; *People v. Szeto* (1981) 29 Cal.3d 20, 27.)

"[U]nder section 1111, the corroboration must connect the defendant to the crime *independent* of the accomplice's testimony." (*People v. Romero and Self, supra,* 62 Cal.4th 1, 32, 36; emphasis in original.) The corroborating evidence must do more than raise a "grave suspicion" of guilt. (*People v. Robinson* (1964) 61 Cal.2d 373, 399; *People v. Santo* (1954) 43 Cal.2d 319, 327.)

### C. Davion Jones Was An Accomplice Since He Was An Aider and Abettor In Count 3; His Testimony Was Not Sufficiently Corroborated.

As discussed in the opening brief (AOB 43-44), Davion Jones was an accomplice since he was an aider and abettor in Count 3. The Court of Appeal agreed but found that his testimony was sufficiently corroborated. (Slip. opn. at p. 13.)

To determine if sufficient corroboration exists, this Court "must eliminate the accomplice's testimony from the case, and examine the evidence of other witnesses to determine if there is any inculpatory evidence tending to connect the defendant with the offense." (*People v. Falconer* (1988) 201 Cal.App.3d 1540, 1543.)

Thus, after excising Jones' testimony, there was no inculpatory evidence that would connect appellant to the crime of attempting to dissuade a witness.

Watson testified that when Jones walked into the courtroom, Jones asked appellant: "Where is he at?" (3 RT 1645.) Appellant told him: "Go sit over there. He over there." (3 RT 1645.) Appellant pointed to where Watson and Douglas were sitting. (3 RT 1645.) Jones then sat behind Watson and Douglas. (3 RT 1647; 4 RT 1843.) Jones sat quietly during the whole proceeding. (4 RT 1845.)

When Deon Williams walked in, he looked at appellant and then sat in the middle section, on the aisle seat on Watson's side. (3 RT 1648; 4 RT 1845.) Williams also sat quietly during the proceeding. (4 RT 1846.)

In *Robinson, supra,* 61 Cal.2d 373, 398-401, this Court held that the accomplice testimony there was not sufficiently corroborated, requiring reversal. (*Ibid.*) The only items of admissible independent evidence against one defendant were his fingerprints in the car used in the charged robbery-murder and his inconsistent statements when questioned as to his whereabouts. (*Id.* at pp. 379, 397-398.)

This Court found the defendant's fingerprints and inconsistent statements to be insufficient because both had plausible innocent explanations. (*Id.* at pp. 398-401.) The defendant knew the car's present and prior owners through his cousin - one of the accomplices - and had been in the car before the charged offense. (*Id.* at pp. 379, 398-399.)

The defendant's fingerprints in the car in *Robinson* were "equally susceptible to an inference that they came there innocently as they [were] to any inference that their presence connect[ed] defendant with the commission of the crime." (*People v. Robinson, supra*, 61 Cal.2d at p. 398.)

Similarly in the present case, there are many innocent explanations as to why Jones and Williams would show up at the preliminary hearing. They were there to support their friend Mr. Hollingsworth. Without Jones' testimony, there was no substantial evidence they came at the direction of appellant. They might have chosen to sit on the other side for a better view of the courtroom. Also, Watson testified both Jones and Williams sat quietly during the entire proceeding. (4 RT 1845, 1846.) Also, there was no substantial evidence

that appellant asked Williams to post the photograph of
Douglas on Instagram.

Without accomplice Jones' testimony, Jones' and
Williams' presence at the preliminary hearing raised no more
than a suspicion that Mr. Hollingsworth might have been
involved in the commission of the charged crime. The
corroborating evidence must do more than raise a "grave
suspicion" of guilt. (*People v. Robinson, supra,* 61 Cal.2d 373,
399; *People v. Santo* (1954) 43 Cal.2d 319, 327.)

"[M]ere speculation" cannot support a conviction.
(*People v. Marshall* (1997) 15 Cal.4th 1, 35.) Thus, there was
no credible corroborating evidence of the accomplice
testimony.

### D.    Reversal Is Required.

Eliminating the accomplice testimony, the independent
evidence here raised no more than a suspicion that Mr.
Hollingsworth might have been involved in the commission of
the charged crime. The corroborating evidence must do more
than raise a "grave suspicion" of guilt. (*People v. Robinson,
supra,* 61 Cal.2d 373, 399; *People v. Santo, supra,* 43 Cal.2d
319, 327.) In the present case, the corroborating evidence was
insufficient and Mr. Hollingsworth's convictions violate
section 1111 and the due process clause of the federal
Constitution. (See *Hicks v. Oklahoma* (1980) 447 U.S. 343;
*People v. Davis* (2005) 36 Cal.4th 510, 548.)

The requirement that accomplice testimony be
corroborated even if it nonetheless constitutes substantial
evidence amounts to a state created liberty interest which

cannot be "arbitrarily abrogated" or ignored without denying a defendant due process as guaranteed under the Fourteenth Amendment. (*Vitek v. Jones* (1980) 445 U.S. 480, 488-489 [state statutes may create liberty interests that are entitled to the protections of federal due process"]; *Hicks v. Oklahoma, supra,* 447 U.S. 343, 346 [arbitrary deprivation of liberty under state law implicates federal due process].) When a judgment is deficient because accomplice testimony has not been sufficiently corroborated, the affected count must be reversed with an order that a retrial is barred. (*People v. Belton* (1979) 23 Cal.3d 516, 526-527; *People v. Falconer* (1988) 201 Cal.App.3d 1540, 1544.)

Since there was no credible, independent evidence corroborating the accomplice testimony pointing to Mr. Hollingsworth having the specific intent of attempting to dissuade a witness, the conviction in count 3 must be reversed.

Thus, the Court of Appeal opinion was an unreasonable application of clearly-established federal law. (U.S. Const., 14th Amend.; 28 U.S.C. § 2254(d)(1); *Williams v. Taylor, supra,* 529 U.S. 362, 405; *In re Winship, supra,* 397 U.S. 358, 364; *Jackson v. Virginia, supra,* 443 U.S. 307, 319.)

III.    **THE COURT ERRED IN FAILING TO INSTRUCT THE
JURY THAT THE PROSECUTION MUST PROVE
"EACH ELEMENT" OF THE CHARGE BEYOND A
REASONABLE DOUBT AND VIOLATED APPELLANT'S
DUE PROCESS RIGHTS UNDER THE FOURTEENTH
AMENDMENT; THIS ISSUE IS RAISED TO PRESERVE
APPELLANT'S RIGHT TO FEDERAL REVIEW.**

A.    **Introduction**

In the present case, the court instructed the jury with
CALJIC No. 2.90, the presumption of innocence and
reasonable doubt instruction. (2 CT 498.) However, it failed to
instruct the jury that it must find each element of the offense
proven beyond a reasonable doubt before reaching a verdict,
and there was nothing in the other instructions informing the
jury of this requirement. The instructions for the individual
charges also fail to inform the jurors that it must find each
element of the offense proven beyond a reasonable doubt.
(CALJIC Nos. 7.14, 8.10, 8.81.10, 8.81.15.1, 9.02; 2 CT 506,
508, 519, 520, 525.) The instructions for the individual
charges simply state "each of the following elements / facts
must be proved." (CALJIC Nos. 7.14, 8.10, 8.81.10, 8.81.15.1,
9.02; 2 CT 506, 508, 519, 520, 525.) They fail to inform the
jury what standard of proof must be used to evaluate each
element.

The United States Supreme Court has long held that a
jury's verdict cannot stand if its instructions do not require it
to find each element of the crime beyond a reasonable doubt.
As shown below, viewed as a whole, the instructions given
here fail to meet that requirement.

Appellant recognizes that this Court has upheld the
appropriateness of the instruction in general. (*People v.
Covarrubias* (2016) 1 Cal.5th 838, 911.) However, appellant
believes that the United States Supreme Court should
address the issue. He makes this argument to preserve his
right to review.

> **B.    Federal Due Process and California Law
> Require the Jury to be Instructed That
> Each Element of the Offenses Must be
> Proven Beyond A Reasonable Doubt.**

The Sixth and Fourteenth Amendments guarantee a
criminal defendant to "a jury determination that [he] is guilty
of every element of the crime with which he is charged,
beyond a reasonable doubt." (*In re Winship, supra,* 397 U.S.
358, 364; *Apprendi v. New Jersey* (2000) 530 U.S. 466, 477.)
A jury must be properly instructed on the prosecution's
burden of proof beyond a reasonable doubt to ensure the
integrity of a criminal conviction. (*Estelle v. Williams* (1976)
425 U.S. 501, 503.) It is error to give an inadequate
instruction on the reasonable doubt burden of proof and the
presumption of innocence. (*Sullivan v. Louisiana, supra,* 508
U.S. 275, 276-282; *People v. Crawford* (1997) 58 Cal.App.4th
815, 824-826.)

"[A] jury's verdict cannot stand if the instructions
provided the jury do not require it to find each element of the
crime under the proper standard of proof." (*Cabana v. Bullock*
(1986) 474 U.S. 376, 384-385, citing *Sandstrom v. Montana*
(1979) 442 U.S. 510; see also *Middleton v. McNeil* (2004) 541
U.S. 433, 437 (per curiam) ["State must prove every element

of the offense, and a jury instruction violates due process if it
fails to give effect to that requirement"]; *Carella v. California,
supra,* 491 U.S. 263, 265 ["Jury instructions relieving States
of [the burden of proving every element of an offense beyond a
reasonable doubt] violate a defendant's due process rights"];
*Speigner v. Jago* (6th Cir. 1979) 603 F.2d 1208, 1214. ["[T]he
Due Process Clause requires proof beyond a reasonable doubt
of every element of a criminal offense. A jury must be
instructed accordingly"].)

In *State v. McHenry* (Wash. Ct. App. 1975) 535 P.2d
843, 846, the court held, "We cannot find harmless error in
the failure of the court to give an instruction to the effect that
each element of the crime was to be proven by the state
beyond a reasonable doubt in order for the jury to arrive at a
verdict of guilty."

Furthermore, the Eighth Circuit holds that the trial
court's "failure to inform the jury of the government's burden
to prove each and every element of the offense would be an
error under clearly established law." (*United States v. Ali* (8th
Cir. 1995) 63 F.3d 710, 715.)

Though not binding, the reasoning in these cases is
sound; thus these cases should be adopted as persuasive
authority here.

     **C.**    **Viewed As A Whole, the Instructions in the
Present Case Failed to Adequately Inform
the Jury That It Must Find Each Element
Was Proved Beyond a Reasonable Doubt.**

Instructions are reviewed as a whole. (*People v. Rundle*
(2008) 43 Cal.4th 76, 149 [court evaluates instructions "as a

whole, not in isolation"].) In the present case, even when viewed as a whole, the instructions failed to adequately inform the jury that it must find each element was proved beyond a reasonable doubt.

In the present case, the court instructed the jury with CALJIC No. 2.90, the presumption of innocence and reasonable doubt instruction: "This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt." (2 CT 498.) CALJIC No. 2.90 fails to instruct the jury that it must find each element of the offense proven beyond a reasonable doubt before reaching a verdict.

Furthermore, *unlike* CALCRIM No. 220, CALJIC No. 2.90 fails to inform the jury that "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt . . . ." (CALCRIM No. 220.) Thus, CALJIC No. 2.90 is even more inadequate than CALCRIM No. 220.

The instructions for the individual charges also fail to inform the jurors that it must find each element of the offense proven beyond a reasonable doubt. (CALJIC Nos. 7.14, 8.10, 8.81.10, 8.81.15.1, 9.02; 2 CT 506, 508, 519, 520, 525.) The instructions for the individual charges simply state "each of the following elements / facts must be proved." (CALJIC Nos. 7.14, 8.10, 8.81.10, 8.81.15.1, 9.02; 2 CT 506, 508, 519, 520, 525.) The instructions fail to inform the jury what standard of proof it must use when evaluating the individual elements of the crimes.

The jury was also instructed with CALJIC No. 2.61, the
instruction which informs the jury that the defendant has the
right not to testify. CALJIC No. 2.61, states: "In deciding
whether or not to testify, the defendant may choose to rely on
the state of the evidence and upon the failure, if any, of the
People to prove beyond a reasonable doubt every essential
element of the charge against him." (2 CT 491.)

However, courts have held that instruction given in a
specific context, like CALJIC No. 2.61, will not cure the
deficiency.

"[A]lthough the trial court instructed with CALJIC No.
2.61 on a defendant's choice not to testify, we conclude that
instruction is insufficient to comport with federal
constitutional requirements even though CALJIC No. 2.61
refers to the possible failure of the prosecutor 'to prove
beyond a reasonable doubt every essential element of the
charge against him.' We cannot presume that a reasonable
doubt instruction given in a *specific* context (e.g., a
defendant's choice not to testify) will necessarily be
understood by all of the jurors to apply *generally* to their
determination of the defendant's guilt on the charged
offenses. We conclude the trial court's instruction with
CALJIC No. 2.61 in this case did *not* effectively inform the
jury that the prosecution had the burden to prove each
element of the charged offense(s) beyond a reasonable doubt."
(*People v. Flores* (2007) 147 Cal.App.4th 199, 216.)

Thus, the instructions viewed as a whole fail to inform
the jury that each element must be proved beyond a
reasonable doubt.

### D.   Reversal Is Required.

Reversal is required because an error relieving the
prosecution of the burden of proving beyond a reasonable
doubt each material element of the charged offense is
structural and defies harmless error analysis. (See *Sullivan v.
Louisiana, supra*, 508 U.S. at pp. 277-278, 282; *Arizona v.
Fulminante* (1991) 499 U.S. 279, 288-295.) Any error "with
consequences that are necessarily unquantifiable and
indeterminate, unquestionably qualifies as 'structural error.'"
(*Sullivan*, 508 U.S. at p. 282.)

In *Sullivan*, the Court considered whether an
unconstitutional jury instruction improperly defining
reasonable doubt could be subjected to harmless error
analysis. (*Id.* at p. 277.) The jury instruction in *Sullivan*
incorrectly defined a reasonable doubt as "such doubt as
would give rise to a grave uncertainty" and "an actual
substantial doubt." (*Cage v. Louisiana* (1990) 498 U.S. 39, 40
[cited by *Sullivan* for the text of the actual jury instructions at
issue].)

The rationale in *Sullivan* for finding the instructional
error as structural was that "the essential connection to a
'beyond a reasonable doubt' factual finding cannot be made
where the instructional error consists of a misdescription of
the burden of proof, which vitiates all the jury's findings. A
reviewing court can only engage in pure speculation--its view

of what a reasonable jury would have done. And when it does
that, the wrong entity judges the defendant guilty." (*Sullivan
v. Louisiana, supra*, 508 U.S. at p. 281, citations and
quotation marks omitted.) As in *Sullivan*, the error in failing
to inform the jury that each element must be proved beyond a
reasonable doubt was "a misdescription of the burden of
proof, which vitiates all the jury's findings." (*Ibid.*)
Accordingly, reversal is required.

     Thus, the Court of Appeal opinion was an unreasonable
application of clearly-established federal law. (U.S. Const.,
14th Amend.; 28 U.S.C. § 2254(d)(1); *Williams v. Taylor,
supra,* 529 U.S. 362, 405; *In re Winship, supra,* 397 U.S. 358,
364; *Jackson v. Virginia, supra,* 443 U.S. 307, 319.)

Case 2:25-cv-01844-PA-DFM    Document 1    Filed 02/28/25    Page 53 of 62    Page ID
#:53

## IV.   THE CUMULATIVE EFFECT OF THE ERRORS WAS PREJUDICIAL AND VIOLATED APPELLANT'S RIGHT TO A FAIR TRIAL AND HIS DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT.

In his opening brief, appellant argued that the cumulative effect of the multiple errors in this case denied him of due process and a fair trial. (AOB 55.)

The United States Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. (*Parle v. Runnels* (9th Cir. 2007) 505 F.3d 922, 927; accord *Chambers v. Mississippi* (1973) 410 U.S. 284, 302-303.) Appellant reasserts that there were numerous errors in this case, which overlapped and reinforced each other.

The court violated Mr. Hollingsworth's constitutional rights by failing to instruct with accomplice instructions. The court failed to instruct the jury that the prosecution had the burden to prove every element of the charges beyond a reasonable doubt. The court's errors deprived Mr. Hollingsworth his right to a fair trial under the Sixth Amendment. Even if any single error was harmless standing alone, the cumulative effect of the errors significantly undermines the confidence in the outcome of the trial and requires reversal.

44

V.    **APPELLANT WAS DEPRIVED OF HIS SIXTH
AMENDMENT RIGHT TO THE EFFECTIVE
ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED
TO MOVE THE COURT TO DISMISS THE SPECIAL
CIRCUMSTANCE ALLEGATIONS AND THE FIREARM
ENHANCEMENTS PURSUANT TO DISTRICT
ATTORNEY GASCÓN'S SPECIAL DIRECTIVES.**

A.    **Introduction**

On December 8, 2020, newly-elected District Attorney
George Gascón issued Special Directive 20-08, which made
changes to the Los Angeles County Legal Policies Manual.
(Special Directive 20-08, p. 1 <https://
da.lacounty.gov/sites/default/files/pdf/SPECIAL-
DIRECTIVE-20-08.pdf/> [as of April 23, 2024].)

Special Directive 20-08 states, in relevant part, that
"sentence enhancements or other sentencing allegations . . .
shall not be filed in any cases and shall be withdrawn in
pending matters." (Special Directive 20-08, p. 1.)

Specifically:

"Special Circumstances allegations resulting in an
LWOP sentence shall not be filed, will not be used for
sentencing, and shall be dismissed or withdrawn from the
charging document." (Special Directive 20-08, p. 2.)

On December 18, 2020, the District Attorney amended
Special Directive 20-08 and added firearm allegations to the
list of sentence enhancements that shall not be filed. (Special
Directive 20-08.2, p. 1 <https://da.lacounty.gov/sites/
default/files/policies/SD-20-08-2.pdf/>[as of April 23,
2024].)

45

For pending cases, "[a]t the first court hearing after this
policy takes effect, DDAs are instructed to orally amend the
charging document to dismiss or withdraw any enhancement
or allegation outlined in this document." (Special Directive 20-
08, p. 2.)

In the present case, the prosecutor filed the initial
information on April 5, 2021, *after* the effective dates of the
Special Directives. (1 CT 237.) The information was
subsequently amended on September 17, 2021. (2 CT 466-
467.) Both information contained the "lying-in-wait" and the
murder of a witness special allegations, and the firearm
allegations. (1 CT 238; 2 CT 466.)

Defense counsel failed to request the prosecutor to
withdraw the murder special circumstances allegations and
the firearm allegations pursuant to the Special Directives.
Counsel also failed to move the court to dismiss the
allegations and enhancements pursuant to the Directives.
Counsel was ineffective in failing to request the prosecutor to
withdraw the special allegations and enhancements and
failing to move the court to dismiss them.

As discussed in the opening brief (AOB 56-62) and in
Argument I(B) below, there is a reasonable probability that,
but for counsel's ineffectiveness, the prosecutor would have
abided by the Special Directives and would have withdrawn
all the sentencing enhancements in the information. The trial
court would have dismissed the special allegations and
firearm enhancements based on the research cited in the
Special Directives.

Thus, the Court of Appeal opinion was an unreasonable application of clearly-established federal law. (U.S. Const., 14th Amend.; 28 U.S.C. § 2254(d)(1); *Williams v. Taylor* (2000) 529 U.S. 362, 405; *In re Winship* (1970) 397 U.S. 358, 364; *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

### B.    There Could Have Been No Tactical Reason for Counsel's Omissions and the Counsel's Ineffectiveness Was Prejudicial.

As discussed in the opening brief (AOB 56-62), counsel's ineffectiveness was prejudicial. (*Strickland v. Washington, supra,* 466 U.S. 668, 694.) The constitutional right to assistance of counsel entitles the criminal defendant to "the reasonably competent assistance of an attorney acting as his diligent conscientious advocate. [Citation.]" (*In re Cordero* (1988) 46 Cal.3d 161, 180.)

Effective counsel would have requested the prosecutor to abide by the Special Directives and not file any special circumstances allegations and firearm allegations in count 1 in the initial information filed on April 5, 2021.

As stated in the Special Directive, for pending cases, "[a]t the first court hearing after this policy takes effect, DDAs are instructed to orally amend the charging document to dismiss or withdraw any enhancement or allegation outlined in this document." (Special Directive 20-08, p. 2.)

In *Nazir v. Superior Court, supra,* 79 Cal.App.5th 478, 498, the appellate court held that "when a court considers on its own motion whether to dismiss a charge or an enhancement, the scope of those interests narrow to reflect

the separation of powers between the prosecution, which has sole discretion to determine whom to charge, what charges to file and pursue, and what punishment to seek from among those potentially available, and the court, which has sole discretion to dismiss a criminal charge." (*Ibid.*, internal citations and quotations omitted.)

Thus, prior to filing of the information, the prosecutor had wide discretion as to what allegations and enhancements to charge. There was a reasonable probability that the prosecutor would have abided by the Special Directives had defense counsel requested the withdrawal of the sentencing enhancements.

Even after filing of the information, defense counsel still had the opportunity to move the court to dismiss the allegations and enhancements pursuant to the Special Directives.

When deciding if allegations and enhancements should be dismissed, the trial court must consider the general objectives of sentencing, mitigating and aggravating factors, circumstances specific to the crime and defendant, and broader societal objectives, such as increasing public safety by reducing recidivism. (*Nazir, supra,* 79 Cal.App.5th 478, 497.) The trial court may also be guided by statutory statements of policy and other circumstances relevant to the case. (*Ibid.*) A policy statement that the court should consider includes Special Directive 20-08, which was "based on research showing that existing sentence enhancements do not deter crime or reduce recidivism," objectives of the criminal

justice system. (*Nazir, supra,* 79 Cal.App.5th 478, 497; see
Cal. Rules of Court, rule 4.410(a)(4) [deterrence] & (a)(8)
[increasing public safety by reducing recidivism].)

When a prosecutor "asks the court to dismiss an
enhancement because the prosecutor, as a representative of
the People, legitimately questions the deterrent effect or value
to public safety of imposing a sentence enhancement," the
trial court may consider such position without frustrating the
appropriate prosecution of a defendant. (*Id.* at p. 499.)
Furthermore, the Legislature has engaged in much criminal
justice reform based on research that did not previously exist.
(*Nazir, supra,* 79 Cal.App.5th 478, 499; see e.g., § 1170,
subd. (b)(6).) The concerns mentioned in Special Directive 20-
08 relevant to deterrence and recidivism are within the spirit
of applicable sentencing considerations. (See *Nazir,* 79
Cal.App.5th 478, 499.)

Thus, there was a reasonable probability that the trial
court would have considered defense counsel's motion to
dismiss the sentencing enhancements based on the research
cited in the Special Directives.

No particular decision by trial counsel to act or not to
act in a particular manner can be regarded as "tactical" or
"strategic" unless the decision was both "rational and
informed." (*In re Marquez, supra,* 1 Cal.4th 584, 606.) It is
inconceivable that defense counsel's omissions could have
benefited appellant in any way since the omission caused Mr.
Hollingsworth to receive a life-without-possibility-of-parole

(LWOP) sentence and added another 25-years-to-life term due to the firearm enhancement.

To establish constitutionally ineffective assistance, a defendant must show not only that counsel's representation fell below an objective standard of reasonableness, but that "counsel's representation subjected the defendant to prejudice; i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Mitcham, supra,* 1 Cal.4th 1027, 1057-1058; see *Strickland v. Washington, supra*, 466 U.S. 668, 687-696.)

There is a reasonable probability that, but for counsel's ineffectiveness, the prosecutor would have abided by the Special Directives and would have withdrawn all the sentencing enhancements in the information. The trial court would have dismissed the special allegations and firearm enhancements based on the research cited in the Special Directives.

This Court should grant review to remedy this wrong.

The Court of Appeal opinion was an unreasonable application of clearly-established federal law. (U.S. Const., 14th Amend.; 28 U.S.C. § 2254(d)(1); *Williams v. Taylor, supra,* 529 U.S. 362, 405; *In re Winship, supra,* 397 U.S. 358, 364; *Jackson v. Virginia, supra,* 443 U.S. 307, 319.)

# VERIFICATION
(C.C.P §446 & 2015.5 28 U.S.C. §1746)

STATE OF CALIFORNIA
COUNTY OF IMPERIAL

I, M. HOLLINGSWORTH DECLARE UNDER PENALTY OF PERJURY THAT I AM THE

DEFENDANT IN THE ABOVE ENTITLED ACTION. I HAVE READ THE FOREGOING DOCUMENTS AND KNOW THE CONTENTS THEREOF AND THE SAME IS TRUE OF MY OWN KNOWLEDGE EXCEPT AS TO MATTERS STATED THEREIN UPON INFORMATION AND BELIEF, AND AS TO THOSE MATTERS, I BELIEVE THEM TO BE TRUE.

EXECUTED THIS 11 DAY OF FEBRUARY , 2025 AT CALIPATRIA STATE PRISON, CALIPATRIA, CALIFORNIA, 92233-500 5 .

_____ (DECLARANT/PRISONER)
SIGNATURE

# PROOF OF SERVICE BY MAIL
(C.C.P. §1013(a) & 2015.5 U.S.C §1742)

I, M. HOLLINGSWORTH AM A RESIDENT OF CALIPATRIA STATE PRISON, IN THE COUNTY OF IMPERIAL, STATE OF CALIFORNIA. I AM OVER EIGHTEEN (18) YEARS OF AGE, AND AM/AM NOT A PARTY OF THE ABOVE ENTITLED ACTION, MY STATE PRISON ADDRESS IS P.O. BOX 500 5 CALIPATRIA STATE PRISON, CALIPATRIA, CALIFORNIA 92233-500 5 .

ON, FEBRUARY 11, 2025 , I SERVED THE FOREGOING:

_____
(SET FORTH EXACT TITLE OF DOCUMENT(S) SERVED)

ON THE PARTY(S) HEREIN BY PLACING A TRUE COPY THEREOF, ENCLOSED IN A SEALED ENVELOPE(S) WITH POSTAGE THEREON FULLY PAID, IN THE UNITED STATES MAIL, IN A DEPOSIT BOX SO PROVIDED AT CALIPATRIA STATE PRISON, CALIPATRIA CALIFORNIA 92233-500 5 .

THERE IS DELIVERY SERVICE BY UNITED STATES MAIL AT THE PLACE SO ADDRESSED AND THERE IS REGULAR COMMUNICATION BY MAIL BETWEEN THE PLACE OF MAILING AND THE SO ADDRESSED. I DELCLARE UNDER PENALTY OF PERJURY THE FOREGOING IS TRUE AND CORRECT.

DATE 02-11-2025

MARQUECE HOLLINGSWORTH
(DECLARANT/PRISONER)



Marquece Hollingsworth #BR1611
B3#238
Calipatria State Prison
P.O. Box 5005
Calipatria, CA 92233

THIS MAIL WAS GENERATED AT
CA Dept. of Corrections & Rehabilitation
CALIPATRIA STATE PRISON

Clerk Of The United States District Court
For The Central District Of California
United States Courthouse
Attn: Intake/Docket Section
255 East Temple Street, Suite TS-134
Los Angeles, California 90012

